

**SO ORDERED.**

**SIGNED this 25 day of February, 2008.**

_____
**A. Thomas Small
United States Bankruptcy Judge**

_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **MARIE JEANETTE JUSTICE** | 06-00869-5-ATS |
|     **DEBTOR** | |
| | |
| **CHRISTOPHER BRUST AND MARY ELLEN BRUST** | |
| | **ADVERSARY PROCEEDING NO.** |
|     **Plaintiffs** | |
| | S-06-00110-5-AP |
|     v. | |
| **MARIE JEANETTE FEW** | |
|     **Defendant.** | |

**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**

The matter before the court in this adversary proceeding is the motion for summary judgment filed by the plaintiffs, Christopher Brust and Mary Ellen Brust. A hearing took place in Raleigh, North Carolina on January 30, 2008.

The debtor, Marie Jeanette Justice (formerly "Marie Jeanette Few"), filed a petition for relief under chapter 13 of the Bankruptcy Code on June 12, 2006. Prior to this filing, Christopher Brust and Mary Ellen Brust filed a complaint against Ms. Justice and her former husband, James A. Few,

in Wake County Superior Court. In the civil action, the Brusts seek extensive damages for an alleged breach of contract, fraud, and unfair and deceptive trade practices. After Ms. Justice's bankruptcy filing, the Brusts filed an adversary proceeding to determine the dischargeability of the debt alleged in the civil action and to recover damages based on the claims raised in that action. In the present motion, the plaintiffs seek summary judgment on the issues of liability, dischargeability, and damages. For the reasons that follow, the motion will be denied.

## Factual Background

In 2001, Mr. Few and Ms. Justice, who were married at the time, placed property that they owned on Thornewood Drive in Cary, North Carolina for sale on the real estate market. After two failed contracts for the sale of the property, the couple received a letter from the Brusts, proposing a lease with a purchase option. On December 18, 2002, the Brusts entered into a lease agreement with Mr. Few to rent the property for a term of one year, with the option to purchase the property "as is" at any time during the initial term. Pursuant to the agreement, the Brusts paid a nonrefundable fee of $6,000 for the option, and were to pay $1,500 per month in rent, with $500 of each payment to be applied to the purchase price. The purchase price under the agreement was $250,000, less a "discount" of $10,000, for a net price of $240,000.

Prior to signing the lease agreement, the Brusts did a walk-through of the house with Mr. Few. Ms. Brust noticed a "bump" in the kitchen floor and asked Mr. Few about it. Mr Few showed her an engineer's report from a structural analysis conducted over the course of approximately three visits to the property to investigate the cause of the bump.[1] The report concluded that the floor

---

[1] The report was the third written by the same company, Champion Engineering, Inc. Champion had first been engaged by a previous prospective purchaser of the property. The second and third visits were at the request of Mr. Few. The report shown to the Brusts was the last in the

2

framing arrangement was compliant with the state building code, but recommended taking various measures to reduce the unevenness of the floor. Mr. Few also showed the Brusts where the basement ceiling had been removed and replaced in order to inspect the bump in the floor above, as well as repairs made to the basement stairs and other parts of the house. Finally, Mr. Few showed the Brusts a residential property disclosure statement, where he made "no representation" as to the condition of the home's foundation and structural components.

After moving into the home, the Brusts became concerned with the unevenness of the floor and tried to obtain a copy of the engineer's report that they had reviewed on the day they signed the lease, as well as copies of the lease itself and the disclosure statement. After repeatedly requesting the documents from Mr. Few to no avail, the Brusts hired their own structural engineer, who told them the house had a "main beam problem" that would eventually require attention.

The Fews divorced in 2004, and by way of a property settlement, Ms. Justice became the sole owner of the property on Thornewood Drive. In September of 2005, the Brusts wrote a letter to Ms. Justice, informing her of their decision to move back to New England after their daughter finished college in 20 months. The Brusts expressed an interest in continuing the "current arrangement" until that time. In late 2005, however, Ms. Justice informed the Brusts that she planned to either put the house on the market or use it as her primary residence; the Brusts vacated shortly thereafter.

In early 2006, the Brusts brought the civil action against both Mr. Few and Ms. Justice, alleging: (1) breach of contract arising from the failure of the home to conform to Mr. Few's representations; (2) fraud arising from Mr. Few's representations concerning the structural integrity

---

series, and it recommended structural modifications and referenced recommendations made in a previous report.

of the home; and (3) violations of the North Carolina Unfair and Deceptive Trade Practices Act. The Brusts have since settled with Mr. Few and are now pursuing their claims against Ms. Justice through the adversary proceeding. The Brusts seek summary judgment on their contract and fraud claims, relief from the automatic stay to prosecute the civil action, and a determination that the debt alleged in the civil action is nondischargeable under § 523(a)(2)(A) of the Bankruptcy Code.

## Summary Judgment Standard

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In making this determination, conflicts are resolved by viewing all facts and inferences to be drawn from the facts in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962) (per curiam). Summary judgment is not a "disfavored procedural shortcut," but an important mechanism for filtering out "claims and defenses [that] have no factual basis." Celotex, 477 U.S. at 327, 106 S. Ct. at 2555. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323, 106 S. Ct. at 2552. Summary judgment should not be granted "unless the moving party has established his right to a judgment with such clarity as to leave no room for controversy." Portis v. Folk Constr. Co., 694 F.2d 520, 522 (8th Cir. 1982) (internal quotations omitted).

## Discussion

The plaintiffs contend that (1) Mr. Few made false statements concerning the structural integrity of the home in order to induce them to enter into the lease agreement, and (2) in reliance

on Mr. Few's representations, they entered the contract, paid a fee for the option, paid monthly rent that included an amount towards the purchase price, and paid for repairs and improvements while considering the option to purchase the property. The debtor argues that there is nothing in the record to substantiate the plaintiffs' claims of false representations and that the plaintiffs' reliance on the purported misrepresentations was neither reasonable nor justifiable.

The primary relief sought by the plaintiffs is a determination that the debt alleged in the civil action is not dischargeable in the defendant's bankruptcy case. Under § 523(a)(2)(A),

> [a] discharge under section . . . 1328(b) of this title does not discharge an individual debtor from any debt . . . (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a)(2)(A). It is the plaintiffs' position that under § 523(a)(2)(A), the defendant is not entitled to a discharge of the alleged debt if the court finds that it was obtained by fraud, regardless of whether the defendant is personally liable or participated in the fraud. However, the evidence before the court is insufficient to establish that the alleged debt was obtained by fraud, false pretenses, or false representations, and therefore the alleged debt is not excepted from discharge under § 523(a)(2)(A).

The key consideration is that the plaintiffs agreed to rent and potentially purchase the home "as is." The lease agreement was created from a standard form document, but it includes an additional term that reads: "[r]ental property renting 'as is.' Tenant to pay repairs of any kind." M. Brust Dep., Ex. 1, Residential Rental Contract between James A. Few and Christopher and Mary Ellen Brust, p. 4 (Dec. 18, 2002). Even more obvious is the wording of the option to purchase, which is plainly drafted, typed in large print, signed by all parties, and provides: "[a]t any time

5

during the initial lease term, tenant shall give the landlord notice of intent to purchase.  At such time landlord and tenant shall enter into a sales agreement to purchase the house 'As Is.'"  Residential Rental Contract, Ex. A, Option to Purchase.  That is the last sentence of the document, and the plaintiffs signed directly below.  Ms. Brust testified that the plaintiffs have purchased several properties before, including one that they owned and managed as a rental property.  M. Brust Dep. at 7-8.  The words "as is," used in connection with a product, generally indicate that the seller makes no warranties as to the item's condition.  Such words associated with a house, especially to buyers who have purchased and managed property before, should raise a glaring red flag that something may be awry.

Further, when the plaintiffs pointed out the bump in the kitchen floor, Mr. Few directed them to a notebook of information on the property that contained a report by an engineer who had examined the unevenness of the floor.  Ms. Brust testified that Mr. Few showed her the report along with the recently replaced ceiling in the basement below the bump, which had been removed to inspect the underside of the floor.  M. Brust Dep. at 11:16-25.  The presence of a report concerning a structural investigation of a house is itself an indicator that issues may have arisen in the past or may exist currently.  Yet the plaintiffs entered the rent-to-own agreement and moved into the house without first engaging their own structural engineer, or even arranging a home inspection.

Along with the engineer's report, Mr. Few showed the plaintiffs a residential property disclosure statement, which he had completed even though not required to do so for a rent-to-own property agreement.  While Mr. Few indicated no knowledge of any problems with the majority of the components of the home, he checked the box indicating "no representation" as to the "foundation, slab . . . or other structural components."  M. Brust Dep., Ex. 3, Residential Property

6

Disclosure Statement, p. 2.  Ms. Brust testified that Mr. Few showed the plaintiffs this document and discussed it with them.  M. Brust Dep. at 11:14-16.  The fact that Mr. Few made "no representation" as to the structural components of the house should have been another indication that perhaps more investigation of the bump in the floor might be warranted before committing a significant amount of money toward the purchase of a home.

The plaintiffs also argue that they relied on Mr. Few's statements in entering the lease agreement and were damaged by paying amounts intended to be credited toward the purchase of the home.  However, any reliance on Mr. Few's representations was unreasonable and unjustifiable in light of the numerous warning signals contained in the documents that Mr. Few voluntarily shared.  The plaintiffs contend, however, that even though the disclosure statement indicated "no representation" as to the structural components of the home, Mr. Few made verbal representations that preclude him from later claiming that the reliance was not justifiable.  According to Ms. Brust's testimony, Mr. Few told the plaintiffs that the bump in the floor had been inspected and "everything checked out fine."  M. Brust Dep. 11:23-25.  But at the same time, Mr. Few discussed the engineer's report with the plaintiffs.  The report indicates that the uneven kitchen floor meets building code requirements, but should be repaired/modified:

> Upon investigating the first floor framing system of the house [on Thornewood Drive, in Cary, North Carolina] I have found that the floor framing arrangement (2 x 10's @ 12" o.c.; 15'-3 span), meets the <u>NC State Building Code, Volume VII – Residential 1997 Edition</u>, pursuant to Table 502.3.1.a.  Apparent excess floor deflection in the kitchen is a result of additional loads passed from the partially finished attic.  As a remedy to reduce these deflections and to stiffen the floor supporting the kitchen and adjacent hallway, please refer to the letter issued to Mr. Greg Stoner on April 20, 2002.
> \* \* \*
> After gaining a better view of the framework from the basement where the two walls meet, I now suspect that the condition of this subject wall (wall W1) is simply due to slight unlevelness of the basement concrete slab, which supports the wall (wall

7

> W2) in the basement adjacent to the lowest staircase. As a reminder, I suggest that each staircase stringer leading to the basement level be given a support to pass its load to the basement floor.

Ex. F, Letter from Stephen T. Champion, P.E., President, Champion Engineering, Inc. to James Few, JF Properties Inc. (August 18, 2002). Not only does the report suggest improvements, it also references a previous report issued on April 20, 2002. This should have sparked questions – including whether that report was prepared for a prospective buyer and, perhaps more importantly, what did it say? Given all the circumstances, any reliance by the plaintiffs on Mr. Few's representations was therefore unreasonable and unjustifiable.[2]

Based on the record as a whole, the court holds that the evidence is insufficient to establish, as a matter of law, that the alleged debt was obtained by fraud, false pretenses, or false representations. The same factual analysis applies to the claims of breach of contract and unfair and deceptive trade practices, and the plaintiffs have likewise failed to establish these claims as a matter of law. The court will therefore deny the plaintiffs' motion for summary judgment.

From the evidence before the court, it would appear that the debtor is entitled to summary judgment. However, the debtor did not move for summary judgment. If the plaintiffs have other evidence (e.g., affidavits or interrogatories) that they would like to submit, they should do so within 20 days of the date of this order. If no compelling evidence is received within 20 days, the court will enter summary judgment in favor of the debtor, Marie Jeanette Justice.

---

[2] The plaintiffs also argue that § 523(a)(2)(A) applies to except the alleged debt from discharge, regardless of whether the defendant is personally liable or participated in any fraud. At the hearing, the defendant conceded an agency relationship, although the court does not necessarily agree. While support exists for the notion that the fraud of one may be imputed to another, there is also authority to the contrary. However, it is not necessary to delve into this issue, based on the court's other holdings in the present matter.

Accordingly, the plaintiffs' motion for summary judgment is **DENIED**.

**SO ORDERED.**

**END OF DOCUMENT**